2000 SD 64

**Thomas L. PRICE, Plaintiff and Appellant,**

v.

**Melinda S. PRICE, Defendant and Appellee,**

No. 21127.

Supreme Court of South Dakota.

Considered on Briefs March 20, 2000.

Decided May 17, 2000.

Drew C. Johnson of Johnson Law Office Aberdeen, South Dakota, Attorneys for plaintiff and appellant.

Thomas M. Tobin of Tonner, Tobin and King, Aberdeen, South Dakota, Attorneys for defendant and appellee.

SABERS, Justice.

[¶ 1.] Melinda Price motioned for change of custody and an increase in alimony. The trial court granted both motions and awarded $338 in child support to Melinda. Tom Price appeals. We reverse and remand the change of custody and child support award, but affirm the alimony award.

## FACTS

[¶ 2.] Tom and Melinda were married June 17, 1972. Shortly thereafter, the couple moved from New York to South Dakota so Tom could practice as a licensed psychologist in Aberdeen. He is a partner in the Northern Plains Psychological Services clinic, which is located in Aberdeen with branch offices in Watertown, Redfield and Waubay.

[¶ 3.] The couple have four children: Zachary, born April 12, 1977; Adam, born January 27, 1979; Joshua, born March 2, 1982; and Stuart, born April 5, 1988.

[¶ 4.] After 21 years of marriage, Tom filed for divorce in July of 1993. Melinda initially sought sole custody of the four minor children. Tom opposed and sought joint custody of the children with physical custody awarded to him. An extensive custody evaluation was conducted in August of 1994. As part of the evaluation, Stuart, because of his young age of six, was tested to "obtain some objective information about [his] parental preference." Stuart completed four of the seven tests with the results showing that his preferred parent was his father. Stuart also "portrayed himself as being very close to, and

protected by, Josh." The three older children were personally interviewed and indicated that "they did not want to continue living with their mother's anger, and that they felt closer to, and safer with, their father." During a home visit with Melinda, the evaluator noted:

> Mrs. Price spent more than 30 minutes discussing her angry feelings about the ending of the marriage, information about Mr. Price's father's suicide, and allegations that Mr. Price had wanted her to have an abortion instead of giving birth to Stuart. All of this was done in the presence of Stuart who appeared to be very sad, and somewhat dissociative, during this discussion. Mrs. Price also went on at length about Mr. Price's attempts to turn the children against her, as well as the difficulties she had experienced financially due to him not giving her enough money.

After interviewing several references provided by both parties, the evaluator recommended that Tom have sole custody of the two oldest boys, Zachary and Adam, and that Tom and Melinda share joint custody of Josh and Stuart with primary physical custody in Tom.

[¶ 5.] Instead of contesting the custodial recommendations, Melinda agreed that she and Tom would share joint legal custody of all four children with physical custody in Tom. However, the older two children were not required to abide by the visitation schedule and were allowed to choose if and when they visited Melinda. The marital property was divided and Melinda was awarded a lump sum of $27,203 in restitutional alimony, $1 in regular alimony and rehabilitative alimony in an amount offsetting her child support obligation to Tom. The Judgment and Final Decree of Divorce was filed on October 6, 1994.

[¶ 6.] Melinda moved to Rochester, New York shortly after the divorce. On February 26, 1996, Melinda motioned for a change in physical custody of Stuart and for an increase in alimony. During the

hearing, the trial court reviewed the 1994 custody evaluation and transcripts of two telephone conversations between Melinda and Stuart and Josh. The transcripts reveal that Melinda was: pressuring Stuart to tell his teachers that he wanted to live with his mom; disparaging Tom to the children; and trying to alienate their affections for Tom. Finding it was in Stuart's best interest to remain with Tom, the trial court denied Melinda's motion for a change in custody.[1] However, the trial court acknowledged Melinda's need for educational training and awarded her $600 in rehabilitative alimony beginning June 1996 and ending June 1998.[2]

[¶ 7.] After completing a two-year training course, Melinda filed, on June 22, 1998, a second motion to change custody of Stuart and a motion to increase alimony. The matter was heard April 28–29, 1999.

[¶ 8.] At this time, Zachary was married, working and attending college full-time and maintaining an independent residence in Aberdeen. The second oldest son, Adam, was attending college full-time and working two part-time jobs, but still resided at home. Joshua, 17–years–old, was a junior in high school and worked part-time. Stuart was 11–years–old and was in the fifth grade.

[¶ 9.] The trial court interviewed Stuart in chambers for 25 minutes, with both counsels present. During this interview, Stuart "expressed a strong preference to live with his mother" in Rochester, New York due to his "close relationship" with her and his feeling that Melinda's boyfriend, Clark, whom Melinda lived with, would provide a "safe environment" for him.

[¶ 10.] In evaluating Stuart's care under Tom, the trial court found: (1) the three older siblings do not regularly interact with Stuart; (2) Stuart is home alone for a minimum of two and one-half hours after school; (3) Tom's relationship with his girlfriend consumes much of Tom's time;[3] and (4) Tom does not spend any time trying to develop Stuart's reading skills beyond putting him in special education classes.

[¶ 11.] Conversely, the trial court found that Melinda was able to provide "special attention" to Stuart by spending more time with him and working with him on his learning disability. The court also noted that Stuart would "flourish" if placed with Melinda because her work schedule permitted her to be available to Stuart more often.

[¶ 12.] The trial court concluded that it was in Stuart's best interest that Melinda be awarded primary physical custody of Stuart, conditioned on Melinda moving out of her boyfriend's home, maintaining her own apartment in New York and attending to Stuart's spiritual needs. The court also concluded that Melinda's alimony be increased to $1,000 per month and that Melinda receive $338 in monthly child support payments from Tom.

[¶ 13.] Tom motioned for reconsideration or new trial. A hearing was held on May 27, 1999 at which Tom told the court that Stuart met with a certified professional counselor in Sioux Falls after the court ordered that physical custody be changed to Melinda. The report reflects that Stuart was prompted, for years, by Melinda to say he wanted to live with her and he was stunned that the trial court awarded custody to Melinda. A transcript of a

1. The trial court also allowed Josh, like Zachary and Adam, to choose if and when he visited Melinda.

2. Melinda appealed the trial court's denial of her motion for change of custody and Tom appealed the increase in rehabilitative alimony. Melinda dismissed her appeal on January 13, 1997. The trial court's determination that rehabilitative alimony be increased for two years was summarily affirmed on April 3, 1997.

3. Tom married Linda Wachtel on August 16, 1997 and divorced her on June 8, 1998. The girlfriend referred to here is Doris Opitz. Tom married her in June of 1999.

post-trial telephone conversation between Stuart and Melinda was also presented to the trial court. During this conversation, Stuart admitted that he was· uncertain whether he actually wanted to live in New York. In response, Melinda told Stuart "everybody is telling you things that aren't true" and that he would love their new apartment once he got there because there were "a thousand" children in the complex and it had three swimming pools on site. The trial court determined there was no evidence of Melinda .exerting influence over Stuart and denied the motion for reconsideration or new trial.

[¶ 14.] Tom also motioned the court to stay the transfer of custody, which was scheduled for June 1, 1999, three days from the date of this hearing. Tom requested that the trial court allow Stuart to stay with him during the pendency of the appeal or until a complete home study was conducted in Rochester, New York because Melinda's new living arrangements had not been disclosed. The trial court determined that Melinda signed a 12–month lease for an apartment in Rochester, New York and denied Tom's motion. Therefore, Stuart has been living with Melinda in Rochester, New York since June 1, 1999.

[¶ 15.] Tom appeals and raises three issues.

[¶ 16.] **1. WHETHER THE TRIAL COURT ERRED IN GRANTING A CHANGE OF PHYSICAL· CUSTODY OF STUART FROM TOM· TO MELINDA.**

[¶ 17.] Tom argues that: (1) it was not in Stuart's best interest to be uprooted from his home in South Dakota to live in Rochester, New York with Melinda; (2) Stuart's stated preference to live with Melinda was the result of Melinda's influence; and (3) Melinda did not present compelling reasons to separate the four siblings.

[¶ 18.] The primary determination in a custody dispute is to ascertain the best interest of the child. In determining the best interest of a child, the court must consider the child's "temporal, mental and moral welfare." SDCL 25–4–45; *Fuerstenberg v. Fuerstenberg,* 1999 SD 35, ¶ 22, 591 N.W.2d 798, 806 (citations omitted). "Trial courts possess broad discretion in deciding the best interests of a child; their decisions will only be disturbed upon a finding of abuse of discretion." *Fuerstenberg,* 1999 SD 35, ¶ 22, 591 N.W.2d at 807 (citations omitted). A court may consider seven factors in determining which parent will have primary care of the child: (1) parental fitness; (2) stability; (3) primary caretaker; (4) child's preference; (5) harmful parental misconduct; (6) separation of siblings; and (7) substantial change in circumstances. We review these seven factors:

[¶ 19.] *A. Parental Fitness*

[¶ 20.] Here, we determine which parent is better equipped to provide for the child's "temporal, mental and moral welfare." SDCL 25–4–45. Some of the factors considered in evaluating parental fitness include:

(1) mental and physical health;

(2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs;

(3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed;

(4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent;

(5) commitment to prepare the child for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and

(6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

*Fuerstenberg*, 1999 SD 35, ¶ 24, 591 N.W.2d at 807 (internal citations omitted).

[¶ 21.] When the parties were initially divorced, a custody evaluation was conducted. After testing the children, interviewing several individuals, and observing the parties with the children, the evaluator recommended that Tom have sole custody of the two oldest boys and that Tom and Melinda share joint custody of Josh and Stuart with primary physical custody in Tom. The evaluator further recommended that Melinda "undergo a complete psychological evaluation" and that:

> [t]he court ... issue an injunction prohibiting [Melinda] from yelling at, or in the presence of, the children, throwing objects or doing physically abusive acts in the presence of the children, making disparaging remarks about [Tom] in the children's presence, and pumping the children for information about the other parent.

The evaluator also recommended that Melinda "take a parenting class from a trained mental health professional."

[¶ 22.] Melinda had not completed any of the evaluator's recommendations when she petitioned for modification in 1996. Nor did she show any signs of improvement. After reviewing transcripts of telephone conversations, the trial court found that during her conversations with Stuart, Melinda referred to Tom as "your dumb father," accused Tom of an affair which destroyed the marriage and commented that Tom might get AIDS from sleeping with his fiancée, which was OK with Melinda.[4]

Based on the evidence, the trial court concluded that Melinda was pressuring Stuart to tell his teachers and others that he wanted to live with her. The trial court also prohibited both parties from "making negative or disparaging comments about the other in the children's presence or, in any way, pressuring the children with regard to the issue of custody."

[¶ 23.] By 1999, Melinda had not completed any of the evaluator's recommendations. Tom introduced the 1994 custody evaluation as well as the 1996 transcripts to the trial court during the second modification proceeding. The trial court did not make any specific findings regarding Melinda's overall parental fitness.

[¶ 24.] At the hearing on the motion for reconsideration or new trial, Tom presented another transcript of a telephone conversation between Melinda and Stuart. The transcript reflects that Melinda continues to belittle Tom to Stuart and pressures Stuart into saying he wants to live with her:

> Melinda: Are you still sure you want to come here?
>
> Stuart: Sort of. Sort of not.
>
> Melinda: Stu, why? I thought this is what you wanted?
>
> Stuart: Well ... actually, now I just thought of something. Yes.
>
> Melinda: Yeah, because everybody is working on you aren't they, Stu?
>
> Stuart: Huh?

---

4. The trial court reviewed a transcript of a telephone conversation taped on February 14, 1996. During the conversation, Melinda was crying and repeatedly asked Stuart about Tom's new engagement to Linda Wachtel. She told Stuart to "give [Linda] a bad time" so that Stuart could live with Melinda.

During this conversation, Josh also got on the telephone and spoke with Melinda. She told Josh that Tom was having sex with Linda during their marriage, but Josh did not believe her. She further told him: "I can't believe that you would just accept somebody else being your mother." The transcript indicates that Melinda was crying and yelling at Josh about the relationship between Tom and Linda. She concluded:

> [Linda will] have sex with [Tom] every night, so, your father will be very happy, very happy. And the more you guys are gone, the happier he'll be. The more time they can be together, the happier they'll be ... when you guys aren't around. And I know you don't like to hear it either, but it's true. It's a big thing in your dad's life. But just remember, Josh, [your] mom's here for you.

Melinda: Because everybody is telling you things that aren't true aren't' they, Stu?

\* \* \*

Melinda: You still want to? You want to try it don't you?

Stuart: Yes. Yeah. Now I do.

Melinda: Yeah? ·Well, you tell me that when you're on the phone ·with me but .... apparently when I'm out of sight and [ ] mind, you say other things there. Is that correct?

Stuart: ummm . . . . Yep.

Melinda: Yep. Your brothers are trying to convince you and all this stuff... I know what is going on back there. I am well aware of it. Stuey, we're going to have such a good time and now Dad wants to keep you for the beginning of the summer instead of the end of the summer and I want it the other way around and if that is the way it is, you won't be able to play traveling soccer.

Stuart: Oh, no way!

Melinda: I'm fighting it, Stuey. Nothing concrete [mind] you. We have no idea. . . .

Stuart: Right now I'll say no.

Melinda also told Stuart, "Don't tell your brothers anything that I'm telling you."

[¶ 25.] Given the history of Melinda's belittling Tom to the children and attempting to influence them, there is little reason to believe that anything has changed since August of 1994, the date of the last custody evaluation. Based on the record evidence, Tom appears to be best equipped to provide for Stuart's temporal, mental and moral welfare.

[¶ 26.] *B. Stability*

■ [¶ 27.] This determination is which parent is able to provide a stable and consistent home environment. Factors considered include:

(1) the relationship and interaction of the child with the parents, step-parents, siblings and extended families;

(2) the child's adjustment to home, school and community;

(3) the parent with whom the child has formed a closer attachment, as attachment between parent and child is an important developmental phenomena and breaking a healthy attachment can cause detriment; and

(4) continuity, because when a child has been in one custodial setting for a long time pursuant to court order or by agreement, a court ought to be reluctant to make a change if only a theoretical or slight advantage for the child might be gained.

*Id.* at ¶ 26 (internal citations omitted).

[¶ 28.] Stuart has attended the same school, was raised in the same house and lived in the same community all his life, with the exception of visitations with Melinda in Rochester. His siblings and father live in Aberdeen, South Dakota. Tom regularly attended church with all four boys, an ·activity Melinda did not participate in, even during the marriage. At the time of the hearing, Tom had physical custody of Stuart for nearly 5 years.

[¶ 29.] In justifying the change of custody, the trial court found that Stuart had a close relationship with his mother and desired to live with her because he would receive· more individualized attention from her.[5] The trial court also found:

5. During trial, Melinda presented a letter written by Stuart to Melinda's attorney in July of 1998, when Stuart was visiting Melinda:
I want to live with my mom because I'm scared of my dad. I heard my dad and [L]inda fighting and my dad hit [L]inda. I heard [L]inda say stop it but my dad didn't. They did not know that I was up and listening. I'm scared my dad will hit me too. My brother [J]osh mostly yells at me for everything and makes me do his things. My family leaves me alone at times which I

As a further change of circumstances since June of 1996, Stuart has also been engaged in a special education class which has improved his success in his school work. The type of special education classes that Stuart can benefit from are available in the State of New York living with [Melinda].

Only a "theoretical or slight advantage" would be gained for Stuart in New York because, as the trial court noted, the classes he was attending in Aberdeen were improving his "success in his school work."

[¶ 30.] The trial court also determined that Stuart wanted to live with Melinda because *her boyfriend,* Clark, "provided a safe environment in which Stuart could participate in all of the activities and socialization necessary for a[n] 11–year–old boy." The trial court ordered Melinda to move out of Clark's house and maintain her own apartment; therefore, the finding that Clark could provide a "safe environment" for Stuart is somewhat immaterial as the question is whether *Melinda* could provide a safe environment for Stuart by herself. Obviously, no home study or custody evaluation was performed in the home where Melinda would be living with Stuart.[6]

[¶ 31.] *C. Primary Caretaker*

 [¶ 32.] Many jurisdictions give preference to the primary caretaker. *Id.* at ¶ 28. This factor determines the person most committed and involved in parenting the child and is also a "fair indicator of which parent has been more responsible to the child in the past." *Id.* The trial court must consider who was more devoted to the child *before* the custodial dispute arose. *Id.*

 [¶ 33.] The primary caretaker can be identified by determining "which parent invested predominant time, care and consistency in raising the child." *Id.*

> It is evidenced in such matters as spending time with the child, preparing meals, playing, attending to medical care, choosing clothing, involvement in school, attending the child's extracurricular activities, reading to the child, preparing birthday parties, knowing the pediatrician, consistent disciplining, arranging transportation, and providing appropriate clothing, foods and toys.

*Id.* "Closely related to this question is the issue of which parent has more time available to spend with the child." *Id.* (citation omitted).

 [¶ 34.] Both parties are employed. Tom works over 40 hours per week. On the days he travels to the branch offices, he begins his days early so that he is regularly home by 6:00 p.m.; sometimes, however, he is home by 4:00 or 5:00, depending on his schedule. From 1994 to 1999, he was the primary caretaker of Stuart. At the time of the hearing, Tom was responsible for meeting Stuart's edu-

---

do not like. In my house in Aberdeen there is always a lot of changes, like Linda, Doris, my dad drinking and my brothers and my dad are seldom home. With my mom she's always there for me and we do a lot of things together.

Please let me stay with my mom.

Tom argues that Stuart is not scared of him and that Melinda coerced Stuart to write the letter. He claims that Stuart never heard the disagreement between himself and Linda; rather, it was Linda who told her version to Melinda, after Linda's divorce from Tom.

**6.** Melinda presented a home study that was performed on September 3, 1998 while Stuart was visiting her in New York for the summer.

The home study was conducted at Clark's home, where Melinda was residing at the time. However, because Melinda no longer resides there, the "home and neighborhood" portion is questionable.

The interviewer also met with Stuart and, as indicated above at footnote 5, noted that Stuart "is afraid of his father, having witnessed fights between his father and Linda in which they were 'yelling at each other'" and Tom hit Linda. The report also reflects that Stuart stated that he would miss his brothers if he were allowed to live in New York, but "some of [his] friends remind [him] of [his] brothers." The interviewer concluded that she would "have no reservations to Stuart's living in this situation."

cational, medical and emotional needs. Tom planned the birthday parties for Stuart, took him to church and involved him in extracurricular activities, such as hockey and soccer. Tom also enrolled Stuart in a summer reading clinic program at Northern State University to help him with his learning disability. Around the house, Stuart was responsible for taking care of the dogs, taking out the garbage and cleaning his own room. On occasion when warranted, Tom disciplined Stuart by withholding privileges that Stuart considered important.

[¶ 35.] Clearly, Tom was the primary caretaker at the time of the hearing.[7] The trial court made no specific findings regarding the manner Melinda proposed to care for Stuart on a permanent daily basis while she was working. The court found that Melinda, who works 35–40 hours per week, would be able to give Stuart more time than Tom.

### [¶ 36.] *D. Child's Preference*

[¶ 37.] SDCL 25-4-45 provides that "[i]f the child is of a sufficient age to form an intelligent preference, the court *may* consider that preference ...." (emphasis added). While the final decision rests with the court, a child's parental preference deserves some consideration.

[¶ 38.] Here, Stuart expressed to the trial court that he wanted to live with his mother. The trial court stated that Stuart felt close to his mother, wanted to receive more individualized attention and felt like he was in a "safe environment"

with Clark. After the court awarded physical custody to Melinda, Tom claims that Stuart was stressed about the move and was confused. Therefore, Tom took him to a counselor in Sioux Falls, who met with Stuart and received letters from Zachary, Adam and Josh. During the hearing on Tom's motion for reconsideration, Tom presented the counselor's report, which provides that Stuart is easily influenced and "has had years of being primed to respond in a way that his mother desires." The counselor further notes:

> It appears that Melinda may be suffering from some personality disorder that contributes to her verbal and psychological abuse of her children.... I believe it would [be] in Stuart's best interest ... that Melinda have [a] full psychological evaluation by a qualified psychologist. .... It is also suggest[ed] that another full custody evaluation be completed prior to a change in physical care of Stuart.

[¶ 39.] Tom also presented the trial court with a transcript of a post-trial, telephone conversation between Melinda and Stuart. During this conversation, Stuart expressed that he was not sure whether he wanted to live with his mother and stated he was "confused." Melinda also validated his confusion by stating: "you tell me [you want to live with me] when you're on the phone with me, but ... apparently when I'm out of sight and ... mind, you say other things there." Stuart responded, "yep."

[¶ 40.] Based on Melinda's history and pattern of attempting to alienate her chil-

---

7. Melinda argues that Tom allows Stuart to watch violent programs on television; namely, an adult cartoon entitled "South Park" and "All-Star Wrestling." Tom asserts, however, that "South Park" was introduced into his home after Adam returned from a visit with Melinda.

Melinda further claims that Tom allowed Stuart to witness his brothers sleeping in the same cabins as their girlfriends when they went on a cruise for a family reunion. Tom counters by arguing that both Zachary and Adam had attained the age of majority, Zachary was engaged to his girlfriend and Adam

and his girlfriend slept in the same cabin as Tom did.

Finally, Melinda claims that Stuart is left at home alone after school and sometimes in the evenings. Tom testified that Stuart had a babysitter until January of 1999 when Stuart insisted that he was the only fifth-grader that still had a babysitter after school. After speaking with several individuals, Tom allowed Stuart to stay home alone after school. Tom, however, provided Stuart with a list of phone numbers to reach Tom or others, and Tom called in and checked on him after school.

dren from Tom, Stuart's expressed preference can not be afforded great weight. The standard remains the best interest of Stuart and an 11–year–old child can not always determine his own best interest.

[¶ 41.] *E. Harmful Parental Misconduct*

[¶ 42.] This factor is only considered when "a parent's marital misconduct has a harmful effect on a child...." *Fuerstenberg*, 1999 SD 35, ¶ 31, 591 N.W.2d at 809. "[T]he harmful effect is self-evident when parental misconduct is committed in the presence of a child old enough to perceive the misconduct." *Id.*

[¶ 43.] In 1994, the custody evaluation reflected that the three older children thought Melinda was angry and they felt safer with Tom. The evaluator's experience with Melinda was also revealing: Melinda told the evaluator how angry she was with Tom and told the evaluator that Tom wanted her to abort Stuart, all in the presence of Stuart who appeared "sad and somewhat dissociative." In 1996, the trial court found that Melinda was pressuring Stuart into telling his teachers that he wanted to live with Melinda. It also found that Melinda, in her conversations with Stuart, then 8–years–old, referred to Tom as "your dumb father," accused Tom of an affair which destroyed the marriage and commented that Tom might get AIDS from sleeping with his then-fiancée.

[¶ 44.] The trial court made no findings that Melinda's attempts to alienate the children against Tom, which allegedly began during the marriage, have ceased.

[¶ 45.] *F. Separating Siblings*

[¶ 46.] "Siblings should not be separated absent compelling circumstances." *Id.* at ¶ 32. "Justice requires that society exercise its moral duty to insure that children in a family enjoy the right to remain together, to share each other's lives, and to grow up together, until such time as necessity and the welfare of the children, itself, requires their separation." *Id.* (quoting

*Mayer v. Mayer*, 397 N.W.2d 638, 644 (S.D.1986)).

[¶ 47.] The trial court found that the Price family dynamics have changed substantially since 1994. Stuart is the youngest of four boys. The oldest two boys reached majority age. Zachary is married, works and attends college full-time in Aberdeen. Adam works and attends college, but lives with Tom, Josh and Stuart. Josh was 17 at the time of the hearing and a junior in high school. Now, he is 18–years–old and a senior in high school. Josh did not testify at trial.

[¶ 48.] The trial court found that "compelling reasons [exist] why [Stuart] could ... be separated from his siblings because the two older ones are on their own. Josh is 17. He has his vehicle, and he is driving around with his friends. He doesn't have a lot of time for an 11–year–old." It also found the older boys did not spend a substantial amount of time with Stuart; i.e. "they do not play a role in his education, support, maintenance or supervision, except on a superficial basis."

[¶ 49.] Siblings are not responsible for the "education, support, maintenance or supervision" of each other. The purpose in requiring a trial court to have compelling reasons before separating siblings is to ensure that they are afforded "the right to remain together, to share each other's lives, and to grow up together." *Id.* (quoting *Mayer*, 397 N.W.2d at 644). The fact that a 17–year–old has a car and drives around with friends does not amount to a compelling reason to separate siblings.

[¶ 50.] It appears that the sibling relationship between Josh and Stuart is not unusual. Stuart accused Josh of yelling at him and making him do Josh's chores. There was also evidence that the two brothers were close, they frequently bowled, played video games and went to restaurants together. The trial court found that there was "no close relationship" between Josh and Stuart, which is disputed. Overall, there did not appear to

be compelling reasons to separate Stuart from his siblings.

### [¶ 51.] *G. Substantial Change in Circumstances*

[¶ 52.] To modify a custody decree after a contested hearing, the moving party must show a substantial change in circumstances. *Mayer*, 397 N.W.2d at 640. Here, the original decree awarded custody to Tom pursuant to an agreement by the parties. However, Melinda sought a change in custody of Stuart in 1996 and that issue was contested. Therefore, Melinda must show that a substantial change in circumstances exists since 1996.

[¶ 53.] The trial court found a change in circumstances existed: (1) Stuart's parental preference changed since 1994; (2) the relationship between Josh and Stuart differed from 1996; (3) Tom is not home when Stuart gets home from school and is occasionally gone in the evenings; (4) Tom does not assist Stuart with his homework at night; and (5) Tom does not read with Stuart like he did previously.

### Conclusion

[¶ 54.] Although we are satisfied the change in circumstances was sufficient, we do not agree that the decision to change custody of Stuart from Tom to Melinda was correct.

[¶ 55.] Stuart's claimed parental preference and his version of his relationship with Josh are both highly suspect. The trial court's decision appears premised on the parent with the most available time. Although having more available time is important, a change of custody can not be justified on that factor to the exclusion of others and the trial court did not make any specific findings on the manner that Tom's work schedule substantially differed from 1996.

[¶ 56.] These seven factors are guidelines and a trial court is not expected to make findings on all seven. However, the trial court's decision should be "balanced and methodical," *Fuerstenberg*, 1999

SD 35, ¶ 35, 591 N.W.2d at 810, and should be based on "the best interest of children and not the shortcomings of the custodial parent." *Mayer*, 397 N.W.2d at 642 (quoting *Haak v. Haak*, 323 N.W.2d 128, 130 (S.D.1982)).

[¶ 57.] Based on the record evidence, we determine that the trial court abused its discretion in awarding physical custody to Melinda. "The predominant concern is the child's best interest and each case turns on its own facts in determining which parent can administer more effectively to the long range interests of the child." *Mayer*, 397 N.W.2d at 642 (citation omitted). Considering Melinda's history of attempting to alienate Stuart from Tom and her expression of anger for Tom to Stuart, we are convinced that Tom is the parent best equipped to handle Stuart's "temporal, mental and moral welfare." We hold that the trial court abused its discretion in awarding physical custody to Melinda and we reverse.

### [¶ 58.] 2. WHETHER MELINDA DEMONSTRATED A CHANGE OF CIRCUMSTANCES TO JUSTIFY AN INCREASE IN PERMANENT ALIMONY.

[¶ 59.] In modifying alimony, the party seeking modification must establish a change of circumstances. *Lampert v. Lampert*, 388 N.W.2d 899, 902 (S.D.1986).

[¶ 60.] The parties were divorced in 1994. Melinda was awarded a lump sum of $27,203 in restitutional alimony, $1 in permanent alimony and rehabilitative alimony which offset her child support obligation to Tom. In 1996, she was awarded $600 per month in rehabilitative alimony, beginning June 1996 and ending June 1998, so she could attend a two-year training course. As rehabilitative alimony ended, Melinda petitioned to increase the permanent alimony award. The trial court awarded permanent alimony of $1,000 per month.

[¶ 61.] In awarding permanent alimony, the trial court must consider six factors:

(1) the length of the marriage;

(2) the respective earning capacity of the parties;

(3) their respective financial condition after the property division;

(4) their respective age, health and physical condition;

(5) their station in life or social standing; and

(6) the relative fault in the termination of the marriage.

*Jones v. Jones,* 1996 SD 2, ¶ 21, 542 N.W.2d 119, 124 (citation omitted).

[¶ 62.] The parties were married for 22 years. Tom is a licensed psychologist and is one of two partners in Northern Plains Psychiatric Services. His 1997 income tax return reflects that his total income was $160,221, which includes $13,300 of his second ex-wife's income. His return for 1998 shows total income of $109,206.

[¶ 63.] Melinda did not work outside the home during the marriage. She currently has a two-year degree in travel and tourism and is a ticket salesperson with Continental Airlines, working 35–40 hours per week at $8.01 an hour. She has an annual gross income of $14,500 to $16,000.

[¶ 64.] In the divorce, Melinda was awarded $80,685 in marital property with $1,658 in debt netting $79,027.[8] Tom was awarded $118,391 in marital assets with $104,923 in debt netting $13,468. Both parties are in good physical condition and are able to work.

[¶ 65.] Fault for the deterioration of the marriage was not addressed at the time of the divorce. Tom now claims that Melinda was to blame because she: (1) constantly belittled him in front of the children; (2) used vulgarity when talking to the chil-

dren; (3) spent more money than the family had to spend; (4) was an incompetent housekeeper; (5) was unwilling to cook meals for the family; (6) slept late in the morning and did not get the kids off to school; (7) expressed antagonism toward his success in his career; and (8) refused to attempt to reconcile these faults and attempt to save the marriage. Melinda claims she was not at fault for the divorce but claims that Tom's extramarital affair caused the divorce. The trial court did not determine which party was at fault.

[¶ 66.] Melinda submitted a list of anticipated, ordinary expenses she would incur once she was living in her own apartment in New York. The total was $2,668.50 per month or $32,022 annually. Tom submitted his estimated personal expenses for 1999. His monthly total, for himself, Josh and Stuart, was $10,464.68 or $125,573 annually.

[¶ 67.] Based on all the facts and circumstances, there is no showing that the trial court abused its discretion in awarding permanent alimony to Melinda of $1,000 per month. We affirm.

[¶ 68.] **3. CHILD SUPPORT AND APPELLATE ATTORNEY'S FEES.**

[¶ 69.] In Issue 1, we reversed the change of physical custody to Melinda. Therefore, the award of child support to Melinda is also reversed and remanded to determine, after considering *all* income available to Melinda, the amount of child support Melinda shall pay to Tom. *See Peterson v. Peterson,* 2000 SD 58, 610 N.W.2d 69.

[¶ 70.] Additionally, Melinda motions this court for an award of $4,378.33 in appellate attorney fees. The motion is accompanied by an itemized statement of costs incurred and legal services rendered

---

**8.** During the pendency of these motions, Melinda filed for bankruptcy in February of 1999. Approximately $25,000 in debt was discharged, leaving Melinda with $15,000 in student loans and federal and state income tax debts. The trial court noted that the bankruptcy was necessary "in order [for Melinda] to have the ability to provide a decent life for herself and for Stuart."

in accord with *Malcolm v. Malcolm*, 365 N.W.2d 863, 866 (S.D.1985). Factors considered in awarding appellate attorney's fees are: "the property owned by each party; their relative incomes; the liquidity of the assets; and whether either party unreasonably increased the time spent on the case." *Weekley v. Weekley*, 1999 SD 162, ¶ 27, 604 N.W.2d 19, 26 (citations omitted). Based upon our consideration of these factors, Tom shall pay Melinda appellate attorney's fees of $1,000.

[¶ 71.] MILLER, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 72.] AMUNDSON, Justice, concurs in part and dissents in part.

[¶ 73.] GILBERTSON, Justice, deeming himself disqualified, did not participate.

AMUNDSON, Justice (concurring in part and dissenting in part).

[¶ 74.] I respectfully dissent on issue two.

[¶ 75.] We have often stated that to obtain a modification of alimony, the moving party must establish that a change in circumstances has occurred since the original decree was entered. *See Olson v. Olson*, 1996 SD 90, ¶ 10, 552 N.W.2d 396, 399 (citations omitted). The trial court must limit its review to "changes occurring since the time of the divorce" and "whether the economic circumstances of the parties have changed since the award such that the original award is now either insufficient or excessive." *Id.*, ¶ 11. Further, the "trial court's findings … must support its conclusion on an award of alimony." *Eichmann v. Eichmann*, 485 N.W.2d 206, 207 (S.D.1992) (citations omitted).

[¶ 76.] In the present case, the trial court had ordered that the custody of Stuart go to Melinda, but that Melinda must obtain her own apartment and no longer reside with her boyfriend. To support her request for an increase in alimony, Melinda presented evidence depicting her monthly expenses. She provided two breakdowns of her expenses: $2083.50 if she continued to live with her boyfriend and $2668.50 if she obtained her own apartment. A review of these two exhibits reflects that many of Melinda's expenses were identical, regardless of whether she lives with her boyfriend or lives alone. The trial court further found that Melinda's monthly "take-home pay" would be around $800.[9]

[¶ 77.] Both the trial court and the majority opinion held, in a conclusory fashion, that a change of circumstances existed to support an alimony award of $1,000. Since this alimony award, however, this Court has reversed the trial court's decision and allowed Stuart to remain in the custody of Tom. Based upon this determination, the "economic circumstances" of the parties are not the same as what the trial court reviewed in determining the alimony award; therefore, a 1000 percent increase in alimony is not appropriate in this case.

[¶ 78.] Despite the fact that Melinda has not reached a level of financial stability like Tom has, I can not condone such a large increase in alimony based upon this record. The trial court did not detail how it came up with the $1000 alimony figure, it only stated that a "change of circumstances exist creating a great need on behalf of [Melinda] for additional income in which to be self-supporting." Since Melinda is not going to obtain custody of Stuart, as the trial court originally ordered, the circumstances for which the alimony award

---

9. It is clear from the record that Melinda has undergone severe financial difficulties. She spent all of her rehabilitative alimony award and eventually filed for bankruptcy. It is also troubling that Melinda depicts here monthly income as around $800, which the trial court and this Court agreed with, but estimates her monthly expenses ranging from $2,083.50 to $2,668.50. Her estimated expenses clearly exceed her monthly income by a vast amount.

was based have changed. Therefore, I would reverse and remand the alimony award back to the trial court for reconsideration based upon this Court's decision to allow the custody of Stuart to remain with Tom.