#25073-a-DG

**2010 SD 12**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

KELLY JO KREPS,                                Plaintiff and Appellant,

  v.

JASON ALAN KREPS,                          Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

HONORABLE DOUGLAS E. HOFFMAN
Judge

* * * *

RONALD A. PARSONS, JR. of
Johnson, Heidepriem,
  Abdallah & Johnson, LLP
Sioux Falls, South Dakota                 Attorneys for plaintiff
                                          and appellant.


GREGORY T. BREWERS of
Strange, Farrell, Johnson & Brewers, PC
Sioux Falls, South Dakota                 Attorneys for defendant
                                          and appellee.

* * * *

ARGUED OCTOBER 5, 2009

OPINION FILED **02/10/10**

GILBERTSON, Chief Justice

[¶1.]     After a custody trial, Father received primary physical care of the three children born during the marriage.  Mother appeals contending the trial court abused its discretion when it did not consider her status as the primary physical parent as paramount to all other child custody factors.  Mother also argues the trial court abused its discretion when it allegedly failed to accept the custody evaluator's report and failed to focus on the entire evidentiary record.  We affirm.

## FACTS

[¶2.]     Jason Kreps, age thirty-eight at the time of trial in September 2008, and Kelly Jo Kreps, age forty-four at the time of trial, began dating in 2002.  The couple became pregnant with their first child in the fall of that year.  The couple married in January 2003, and their son Dylan was born on June 23, 2003, in Des Moines, Iowa, where the couple resided.

[¶3.]     During the time the couple dated, Jason assisted Kelly with finding a lawyer to help her get reinstated into medical school.  Kelly was able to complete her medical degree in the spring of 2004.  She then accepted a residency in Kirskville, Missouri, a community three to four hours south of Des Moines, which was anticipated to last four to five years.  During Kelly's residency, Jason was able to reduce his work week to just three days a week.  He spent the other four days in Kirksville taking care of Dylan while Kelly was working.  Jason would often bring Dylan back to Des Moines with him, and while Jason worked Dylan would stay at the family home with a baby sitter until around 3 p.m. when Jason would return from work.  Dylan would sometimes stay in Kirksville for the three days while

Jason worked in Des Moines, but due to the lack of a suitable baby sitter and Kelly's long hours in the residency program it became difficult for her to care for Dylan. After four months in Kirksville, Kelly resigned from the residency program and returned to Des Moines in the fall of 2004. With the help of her relatives, Kelly was able to find a position in a residency program in Sioux Falls, South Dakota, to commence in June or July of 2005.

[¶4.]     The couple planned to relocate the family to Sioux Falls over the summer. At that time, they found out they were expecting twin girls. Kelly's due date for the twins was December 13.

[¶5.]     By early summer of 2005, the marital relationship became strained. Communication between the couple was poor. The parties reached a breaking point when an argument between them ended in Kelly calling the police who arrested Jason. An automatic restraining order was entered against him. Jason was originally charged with domestic assault. The domestic assault charge was dropped and Jason received a deferred sentence on a disorderly conduct charge.

[¶6.]     Kelly moved to South Dakota in June of 2005 and served Jason with divorce papers in July and a petition for custody of Dylan. For the first three months Kelly was living in Sioux Falls with Dylan, the divorce and custody petition were pending in Iowa. While the custody petition was pending, Kelly did not permit Jason more than a few hours of visitation with Dylan at any one time.

[¶7.]     On August 17, 2005, the Iowa District Court for Polk County entered a temporary custody and visitation order. That order granted the parties joint legal custody with Kelly having primary physical custody of Dylan. The order provided

Jason twice a month visitation with Dylan from Wednesday through Sunday, which required each party to drive to Sioux City, Iowa, to exchange Dylan. The order did not address visitation with the yet to be born twin girls.

[¶8.]     The twins were born by planned cesarean section in late November 2006, two weeks before their original due date. Kelly did not inform Jason the girls were to be delivered on that date. Kelly's sister contacted Jason to advise him of their births shortly after the cesarean section had been performed. Kelly also named the twins without his input. Jason immediately filed a motion for visitation with the twins, but Kelly resisted it contending the Iowa court lacked personal jurisdiction over the twins. For the next twelve months after the birth of the twins, Kelly was able to determine whether and how Jason would have visitation with the twins without any direction by either the Iowa court or a South Dakota court.

[¶9.]     Kelly determined that she would permit Jason to see the twins for one-half hour before Jason picked up Dylan for his scheduled visitation twice each month and another half hour when he returned Dylan after visitation. These half hour visits were conducted in a motel lobby in Sioux Falls. Kelly informed Jason that her breast feeding schedule did not allow for additional visitation other than in half hour increments twice a month. In the fall of 2006, Kelly also raised concerns about Jason and his fiancée, Shelli Robertson, smoking around the children, an accusation that was eventually determined by the trial court to be meritless and an effort to further limit Jason's visitation and contact with the children.

[¶10.]     While living in South Dakota, Kelly also established a pattern of taking the children to routine and emergency medical appointments without telling

Jason until after the visit. Kelly unilaterally determined that it was sufficient to advise Jason within twenty-four hours after such an appointment had taken place. This precluded Jason from being a part of the discussion of the children's medical issues. Kelly's pattern was cited by Jason as another effort on her part to limit his involvement in the children's lives.

[¶11.] In October 2006, the Iowa court dismissed the pending visitation motion and the custody proceedings so that a South Dakota court could determine these issues. Jason immediately filed a motion with the Lincoln County circuit court for custody of the three children and for the appointment of a custody evaluator. In December 2006, the trial court ordered temporary joint legal custody and primary care with Kelly. That order granted Jason visitation with all three of the children every weekend, with three weekend visits per month in Sioux Falls and one in Des Moines. Jason was granted four hours of time with the twins on Saturdays from noon to 4 p.m., and another three hours on Sundays from 11 a.m. to 2 p.m. in order to balance their breast feeding schedule with visitation with their father. The trial court left the holidays open for Jason and Kelly to negotiate and determine how to implement an alternating holiday visitation schedule. A custody evaluation was also ordered, and each party was required to either agree to an evaluator or submit their proposals for an evaluator by December 22, 2006. The parties were also ordered to attempt to mediate both custody and visitation, with mediation to be completed by January 31, 2007.

[¶12.] The parties selected Dr. Andre Clayborne as their mediator, and mediation was attempted in May. When mediation was not successful, Dr.

Clayborne later assumed the responsibilities as the custody evaluator. Originally scheduled for completion by the end of December 2006, home studies were delayed and Kelly's misplaced psychological evaluation caused the process to extend into the spring of 2007.

[¶13.] During the evaluation process, Jason argued that Kelly continued to complicate visitation by not showing up at agreed upon times, refusing to bring the children to Des Moines, refusing to work out an alternating holiday visitation schedule as required by the temporary custody order, and at times ignoring Jason's attempts to communicate with her. In the fall of 2008, the children missed three scheduled visitations in Des Moines with Jason over a twelve-week period due to Kelly's unwillingness or inability to travel and her refusal to permit the visitations in Sioux Falls.

[¶14.] Kelly also refused to provide Jason with contact information, records, or reports from the various daycare providers she had used since moving to South Dakota, which included three different nannies and two or three daycare facilities. Jason was able to locate the most recent daycare used by Kelly and called to get more information. The daycare director told Jason she would be happy to provide information once Kelly called and confirmed that it could be shared with him. Kelly refused to approve the sharing of any information with Jason regarding the children by the daycare facility. Despite two attempts to subpoena records from the daycare provider as to the hours spent there by the children, cost, and progress by Dylan in the pre-school program, the daycare claimed such documentation did not exist. This left Jason without any information about how the children were cared for while

Kelly was at work, or the ability to participate in childcare decisions. All that Jason could ascertain was that the children were generally in daycare Monday through Friday from before 8 a.m. when Kelly had to arrive at work, until her work day concluded. Kelly also placed the children with neighbors and family when she was on-call in the evenings or weekends and needed to be at the hospital, but the amount of time the children spent in daycare was not disclosed by Kelly even when questioned at trial.

[¶15.]     Despite repeated attempts by Jason, Kelly also refused to discuss whether Dylan should attend kindergarten in the fall of 2008 at age five or wait until the following year. Kelly discussed the matter with friends and family, but allowed the time to enroll Dylan to expire without any input from Jason. Jason was forced to accept Kelly's unilateral decision on the matter.

[¶16.]     Dr. Clayborne concluded in his custody evaluation report that both parents were fit. He also reported that he believed that Kelly had been the primary care parent when the couple was married. Based on Kelly's statements and focus on the issue during her interview, Dr. Clayborne reported that he believed Kelly would be slightly more favored in supporting the other parent's relationship with the children. However, Dr. Clayborne reported to the court that it would not be in error placing the children in either parent's care. Nevertheless, Dr. Clayborne recommended that Kelly remain the primary care parent, with Jason receiving liberal visitation. Finally, Dr. Clayborne's report indicated that "[i]n review of the documentation, this evaluator did not find any information which would suggest the children would significantly benefit from a change in custody."

[¶17.]     On September 24, 2008, trial on the matter was finally held. At that time, Dylan was five and the twin girls were almost three years old. During his testimony, Dr. Clayborne testified that in his report he had recommended Kelly have primary physical care. He also stated: "But again, I don't see that Jason could not be in that position." Dr. Clayborne also conceded on cross-examination that the numerous delays in the proceeding worked to Kelly's advantage in giving her more time as the primary care parent, which translated to more time to bond with the children prior to the custody hearing. Finally, Dr. Clayborne testified that when he asked Jason and Kelly whether the visitation was working, both Jason and Kelly replied that it was.

[¶18.]     After trial on the matter, the trial court entered 107 findings of fact and numerous conclusions of law. It found that all three children had formed a strong parental bond with both parents and a good relationship with Ms. Robertson. The trial court also found that prior to Kelly moving to South Dakota, Jason and Kelly appeared to have shared equally as the primary caretaker for Dylan. The trial court further found that the evidence suggested both parties were at equal fault for the disturbance that resulted in domestic assault charges against Jason in the summer of 2005.

[¶19.]     With regard to the issue of which parent had served as the primary care parent, the trial court found that Kelly had been the primary physical caretaker for the children since moving to South Dakota. The trial court further found that Kelly had caused significant delays in the custody evaluation and legal proceedings, which gave her an advantage as the primary care parent during the

time the matter was pending. While it determined that the children had spent significantly more time in Kelly's home than they had in Jason's, the trial court found no substantial evidence to suggest the children would not be able to quickly and fully adjust to spending the majority of their time in Jason's home. It also found that the evidence suggested the children had formed a somewhat closer attachment to Kelly as opposed to Jason due to being in Kelly's primary care. However, the trial court was convinced that strong and healthy attachments to Jason and Ms. Robertson and Jason's extended family existed such that the children were not likely to experience any significant difficulty adjusting to Jason as the primary care parent.

[¶20.] The trial court also found Kelly had demonstrated a "profound lack of ability or willingness to maturely encourage and provide frequent and meaningful contact between the children and Jason, and had failed to foster the children's relationship with Jason." The trial court gave significant weight to Kelly's deficiencies in this regard. It further found that the "detrimental effects and potential effects of Kelly's attempts to alienate the children from Jason significantly outweigh the benefits of keeping the children in Kelly's primary physical custody."

[¶21.] With regard to Jason, the trial court found him to be the more credible witness. It also found that Jason was the parent most willing to maturely encourage and provide frequent and meaningful contact between the children and other parent. The trial court strongly favored Jason in this regard.

[¶22.] The trial court also found Jason demonstrated the greatest commitment to prepare the children for responsible adulthood, and a greater ability

to provide exemplary modeling of what it means to be a good parent, loving spouse, and responsible citizen. It also found if the children were in Jason's custody, they would be likely to spend less time in daycare due to Jason's flexible work schedule and Ms. Robertson's assistance, compared to Kelly's long hours as a resident, which required the children to be in daycare most days before 8 a.m. It found that Jason had strong relationships with his extended family.

[¶23.]     The trial court did not find Kelly's role as primary care parent for the past two and one-half to three and one-half years to be a satisfactory experience. It concluded that the best interest of the children required them to be placed in Jason's primary physical care, subject to Kelly's right to exercise reasonable and liberal visitation. Kelly was granted visitation every other weekend and alternating holidays, with an extended summer visitation period of nine weeks. In its conclusions of law, the trial court reviewed the *Fuerstenberg v. Fuerstenberg*, 1999 SD 35, 591 NW2d 798, factors in detail, but did not align each finding of fact under one of the factors.

[¶24.]     Kelly appeals raising one issue:

> Whether the trial court abused its discretion in rejecting the custody evaluation and removing the children from the primary caretaker.

## STANDARD OF REVIEW

[¶25.]     This Court recently reiterated the standard of review for child custody decisions:

> Child custody decisions are reviewed by this Court under the abuse of discretion standard of review. The credibility of witnesses and the weight afforded to their testimony is also within the discretion of the trial court. " '[A]n abuse of

> discretion refers to a discretion exercised to an end or purpose
> not justified by, and clearly against reason and evidence.' " An
> abuse of discretion occurs in a child custody proceeding when
> the trial court's review of the traditional factors bearing on the
> best interests of the child is scant or incomplete. The broad
> discretion of a trial court in making child custody decisions will
> only be disturbed upon a finding that the trial court abused its
> discretion.

Pietrzak v. Schroeder, 2009 SD 1, ¶37, 759 NW2d 734, 743 (internal citations omitted). Furthermore, we will uphold the trial court's findings of fact unless they are clearly erroneous. *Id.* (citing Anderson v. Anderson, 472 NW2d 519, 520 (SD 1991)). "We will overturn the trial court's findings of fact on appeal only when a complete review of the evidence leaves the Court with a definite and firm conviction that a mistake has been made." *Id.* (quoting Miller v. Jacobsen, 2006 SD 33, ¶19, 714 NW2d 69, 76).

## ANALYSIS AND DECISION

[¶26.] The best interest of the child standard is used by a trial court when parents seek an initial judicial determination of the custody of their children. Kolb v. Kolb, 324 NW2d 279, 283 (SD 1982). Such a hearing does not require that the party requesting a change in a temporary custody order show a substantial change in circumstances. *Id.* The trial court considers the children's temporal, mental, and moral welfare in determining the best interests of the children. *Fuerstenberg,* 1999 SD 35, ¶22, 591 NW2d at 806 (citing SDCL 25-5-10; Jopling v. Jopling, 526 NW2d 712, 717 (SD 1995)).

> The trial court may, but is not required to, consider the following
> factors in determining the best interests and welfare of the
> child: parental fitness, stability, primary caretaker, child's
> preference, harmful parental misconduct, separating siblings,
> and substantial change of circumstances. *Id.,* 1999 SD 35, ¶¶

24-34, 591 NW2d at 807-10. When considering parental fitness, a court may consider:

(1) mental and physical health; (2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs; (3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed; (4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent; (5) commitment to prepare the child for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

*Pietrzak*, 2009 SD 1, ¶41, 759 NW2d at 744 (citing *Fuerstenberg,* 1999 SD 35, ¶24, 759 NW2d at 807-10).

[¶27.]     Kelly argues on appeal that the trial court abused its discretion in removing the children from her primary physical care for three reasons. First, Kelly contends the trial court improperly disregarded Kelly's position as the primary caregiver. Next, she argues that the trial court acted improperly when it rejected the custody evaluator's finding that Kelly was favored as the parent more encouraging of the children's relationship with the other parent. And finally, Kelly argues that trial court erred because it provided no rationale specifically explaining its rejection of the custody evaluator's recommendation and that the court's stated reasons for preferring Jason were either irrelevant or lacked a sound and substantial basis in the record. Kelly contends that a trial court that rejects the most critical recommendation made by a custody evaluator should at least explain in some specific details why it has done so.

*Primary Physical Care*

[¶28.]     Under her first argument, Kelly offers the proposition that the parent who served as the primary caretaker should be the primary factor in determining child custody disputes because it is in the first order of priority in the listing under the *Fuerstenberg* factors.[1]  Kelly relies on the fact that many jurisdictions give preference to the primary caretaker in child custody determinations as noted by this Court in *Price v. Price*, 2000 SD 64, ¶32, 611 NW2d 425, 433.

[¶29.]     We have acknowledged that other jurisdictions place greater emphasis on this factor than others.  *Id.* (citing *Fuerstenberg*, 1999 SD 35, ¶28, 591 NW2d at 808).  However, we have always been clear that the trial court analyzes various factors in making custody determinations, including which parent served as the primary caretaker of the children.  *Id.* ¶18, 611 NW2d at 430.  We have never held that this factor should prevail over all other factors a trial court may consider.  Rather, this factor assists the trial court in determining which of the parents was more devoted to the children prior to the custody dispute, as well as "which parent invested predominant time, care and consistency in raising the child."  *Id.* ¶33, 611 NW2d at 433 (quoting *Fuerstenberg*, 1999 SD 35, ¶28, 591 NW2d at 808).  A trial court should "utilize 'a balanced and [*systematic*] approach' under the best interests

---

1.     This argument is without support in the authorities cited by Kelly in that in both *Price* and *Fuerstenberg*, this Court's analysis considered the primary physical care factor after the parental fitness and stability factors.  *See Price*, 2000 SD 64, ¶¶19-35, 611 NW2d at 430-34; *Fuerstenberg*, 1999 SD 35, ¶¶24-28, 591 NW2d at 807-09.

standard." *Pietrzak*, 2009 SD 1, ¶37, 759 NW2d at 743 (quoting *Fuerstenberg*, 1999 SD 35, ¶23, 591 NW2d at 807).

[¶30.]      In the instant case, the trial court determined that Jason and Kelly both provided primary physical care for Dylan while the couple lived in Des Moines. This finding of fact is supported in the record in that Jason and Kelly both testified that while Kelly was in Kirksville, Missouri for her residency, Jason provided primary care for Dylan in Kirksville during the four days per week he was there and not at work, and then provided care at the family home in Des Moines during the evenings after returning from work when Dylan was often with Jason in Des Moines. At the time Kelly moved to Kirksville, Dylan was approximately ten months old. For the next four months of Dylan's life, Jason provided primary care. Furthermore, while the record does not specify which parent provided the majority of the care before Kelly moved to Kirksville, it does indicate that while Jason was working, Kelly was finishing her medical school training during the first ten months of Dylan's life. The trial court's conclusion that the couple shared primary care while living together in Des Moines is supported by the record.

[¶31.]      With regard to Kelly's role as the primary care parent after she moved to Sioux Falls, the trial court found that Kelly had served in this capacity by manipulating the custody evaluation and the timeline for the legal proceedings in order to log more time as the primary care giver. Kelly also denied Jason visitation during this time, which helped ensure the children were more bonded to her than to Jason by the time the custody trial was heard.

[¶32.]    The trial court considered the primary care parent factor carefully and fully and weighed it against the other six *Fuerstenberg* factors, and its findings of fact are supported by the record. We see no evidentiary error in the trial court's findings of fact for this single *Fuerstenberg* factor, or in its conclusion of law that this factor did not weigh in favor of primary care being placed with Kelly.

### Trial Court's finding that Kelly was not the parent more likely to encourage the children's relationship with the other parent contradicted the evaluator's report.

[¶33.]    Kelly next argues that the trial court erred when it disregarded the custody evaluator's finding that Kelly was the parent more likely to encourage the children's relationship with the other parent. Dr. Clayborne's report stated as follows:

> Regarding which parent will be supportive of the other parent's relationship with the children, this evaluator would suggest that either parent could be favored in this area. That being stated, Kelly was definitely the parent to talk about this issue. Even though she may not agree with some of Jason's values or attitudes, she stated a clear awareness of the importance of Jason participating within each of the children's lives.

Kelly argues that there is no support in the record for the trial court's contrary finding that "Jason is the parent most willing to maturely encourage and provide frequent and meaningful contact between the children and the other parent. Jason is strongly favored in this regard."

[¶34.]    "[J]udges, not custody evaluators, have the responsibility to make custody decisions." Maxner v. Maxner, 2007 SD 30, ¶17, 730 NW2d 619, 623. The trial court is not required to abide by the findings of the custody evaluator, but rather appoints the independent evaluator to perform an objective custody analysis. *Id.* ¶15. However, the custody evaluator's analysis can be mistaken. *Id.* For this

reason, a custody evaluator's report is used as part of the evidence, not as the only evidence available to the trial court. *See id.* ¶18, 730 NW2d at 624. Using all the evidence at its disposal, the trial courts considerable discretion in determining custody disputes is guided by the best interests of the child standard using the multiple *Fuerstenberg* elements to guide it. *Id.* ¶17. There is no requirement in our case law for trial court's to adhere to the recommendations in a custody evaluation.

[¶35.] As Dr. Clayborne admitted at trial, he relied on what the parties self-reported in making some of his assessments. In the instant case, the trial court determined that Jason was a more credible witness than Kelly. It also found that Kelly had blocked Jason's contact with the children on several occasions, attempting to alienate the children from him, and regarded the children as more hers than his. Although Kelly strongly disputes it, there is an evidentiary basis in the record to support these findings of fact.

[¶36.] Dr. Clayborne's report did give a preference for Kelly's retention of custody. However, it found that both parents were fully capable of successfully raising the children as a custodial parent. Dr. Clayborne did not have the benefit of observing Kelly at trial where her statements were subject to cross-examination and testing.

[¶37.] This becomes more significant given Kelly's lack of credibility with the trial court. "An expert's testimony is no more reliable that its foundation. It proves nothing without a supportive factual basis. It may prove little if only partially supported by a factual basis." *In re* M.H., 2005 SD 4, ¶15, 691 NW2d 622, 627 (internal citations omitted). Although Dr. Clayborne concluded otherwise, the trial

court did not abuse its discretion in determining that custody with Jason was in the best interests of the children.

### *Trial Court's stated reasons for preferring Jason over Kelly have an evidentiary basis in the record.*

[¶38.]     Kelly argues that the trial court stitched together three anecdotes, based on bare assertions by Jason, to arrive at the conclusion that Kelly was engaged in an effort to alienate the children from Jason.  She cites as those three anecdotes the naming of the twin girls without consulting Jason, Kelly's decision to breast feed the twins that resulted in minimal contact between them and Jason during this period, and Kelly's failure to consult Jason regarding whether Dylan should enter kindergarten at age five or wait another year.  Kelly attempts to narrow this Court's review down to these three examples noted by the trial court, rather than focusing on how these examples, and numerous others, were utilized by the trial court in assessing the *Fuerstenberg* factors to arrive at its conclusion that it was in the best interest of the children to be in Jason's primary care.

[¶39.]     The trial court found that Kelly viewed the children as more hers than Jason's, blocked contact with Jason, attempted to alienate the children from him, and did not involve him in medical, educational, and daycare decisions.  There were more than these three examples cited in the trial court's findings of fact and in the record to support the ultimate custody decision.  In addition, Jason was repeatedly denied reasonable time with his children during holidays and with the twins for the first year of their lives.  As a consequence, Jason was forced to file motions with the court for almost every holiday due to Kelly's refusal to negotiate an alternating holiday schedule as ordered by the trial court in December 2006.  He also had to

seek court orders to establish reasonable visitation with the twins, which was not established until the twins were one-year-old.

[¶40.] Kelly asks this Court to retry the case by identifying a few examples rather than viewing the record as a whole in light of the *Fuerstenberg* factors. This we will not do. The trial court entered 107 findings of fact that have support in the record. It then entered conclusions of law based on its findings of fact in which it addressed the *Fuerstenberg* factors. It engaged in a balanced and systematic approach under the best interests standard. The result was a determination that addressed what the trial court believed to be in the best interests of the children based on all the evidence submitted. We find no abuse of discretion by the trial court.

[¶41.] Affirmed.

[¶42.] ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.

[¶43.] KONENKAMP, Justice, dissents.

KONENKAMP, Justice (dissenting).

[¶44.] Judicial decisions on children's lives deserve our highest effort. Here is no place for perfunctory procedure. For this reason, I cannot endorse the trial court's flawed process. Although the court at the close of trial issued an oral decision from the bench, which remarks form part of the written findings, much of the findings the court later signed as proposed by winning counsel reflect not the expression of independent judicial thought but the rhetoric of adversarial excess.

[¶45.]     If trial courts fail to "make careful study of the suggested findings in all their bearings before making them official, [it] is quite liable to lead to bad results." Harrigan v. Gilchrist, 99 NW 909, 993 (Wis 1904). The fact findings and conclusions this Court points to as exemplifying a sound decision were, in substance, largely conceived by the winning side. With the exception of three hand-written stylistic changes the trial court made, all the findings proposed by the father's attorney were adopted verbatim. Many of these findings are overreaching and, in several instances, wholly self serving.

[¶46.]     Of all the cases on a trial court's docket, child custody disputes may be the most difficult and contentious. Yet judges must remain above the fray. "Balanced and methodical," a judge's custody decision should reflect impartial patience and careful deliberation and be couched in the court's own dispassionate language. Fuerstenberg v. Fuerstenberg, 1999 SD 35, ¶35, 591 NW2d 798, 810. Findings tainted with one-sided excess fail to promote the appearance of neutrality and fairness.

[¶47.]     Under our rules of civil procedure, "In all actions tried upon the facts without a jury . . ., the court shall . . . find the facts specially and state separately its conclusions of law thereon. . . ." SDCL 15-6-52(a). "Alternatively, the court may direct counsel for the prevailing party to prepare findings[,]" and, upon expiration of the applicable time limits for proposed findings and objections, "the court shall make or enter such findings and conclusions *as may be proper.*" SDCL 15-6-52(a) (emphasis added). By using the term "as may be proper," the rule contemplates that judges will study the proposed findings, eliminate everything not suitably a

part of the determination, add what may have been self-servingly left out, and ensure that all material facts and applicable laws are covered. In the end, attorneys can *draft* findings for the court; they cannot *make* findings for the court.

[¶48.] Certainly we have held that absent "becoming a judicial rubber stamp," a court has the "discretion to adopt those findings of fact and conclusions of law which it deems most appropriate, regardless of their source." *See* Feldhaus v. Schreiner, 2002 SD 65, ¶14, 646 NW2d 753, 757. But uncritical acceptance of lawyer-prepared findings can never be condoned, and *Feldhaus* should not be read as an unreserved endorsement for a trial court signing verbatim findings prepared by the prevailing party. Indeed, in *Feldhaus*, we cited with approval a case suggesting that appellate courts should scrutinize more carefully and give less weight to findings prepared by counsel than those findings prepared by trial judges themselves. *Id.* (citing Leftwich v. Leftwich, 442 A2d 139 (DC 1982)); *see also* Shapiro v. Reg'l Bd. of Sch. Trustees of Cook County, 451 NE2d 1282, 1287 (IllCtApp 1983).

[¶49.] There are good reasons why our rules require trial courts to "find the facts specially" and "state separately" their conclusions of law, or to take only those proposed findings and conclusions "as may be proper." *See* SDCL 15-6-52(a). It is a recognition that decision making is a process, not simply a result. Trial judges who formulate their own findings and conclusions can be satisfied that they have fully and fairly dealt with all the issues before deciding a case. *See* Roberts v. Ross, 344 F2d 747, 751 (3dCir 1965), *superseded in part as recognized in* Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F3d 1209 (3dCir 1993). And, just as

important, the litigants and the reviewing court can know that the judge thoroughly considered all the relevant facts and issues involved.

[¶50.]     Careful attention to the findings offers the assurance, as Judge Wisdom wrote, "that the trial judge did indeed consider all the factual questions thoroughly and would guarantee that each word in the finding is impartially chosen[.]" *Roberts*, 344 F2d at 752 (citing Louis Dreyfus & CIE v. Panama Canal Co., 298 F2d 733, 738 (5thCir 1962)).  On the other hand, if a judge "rubber-stamps the findings and conclusions presented by the winning party . . . it is indeed winning counsel who has disposed of the case in a manner that he thinks will be most advantageous to his client and least subject to successful attack on appeal." *In re* the Marriage of Jensen, 631 P2d 700, 706 (Mont 1981) (Shea, J., concurring).

[¶51.]     So it is here that although the trial judge did not exactly "rubber stamp" counsel's proposed findings, many of the findings nonetheless reflect such imbalance that they cast substantial doubt on the court's process.[2]  A few extracts from the trial court's findings will suffice to demonstrate this concern.  In its bench decision, the court said, "I don't think evidence suggests one or the other is a better parent.  In fact, the evidence from Dr. Clayborne is that they would both be excellent parents and are excellent parents."  But the written findings declare the father to exhibit "the greatest parental fitness in regard to an ability to provide the primary care for these children."  According to finding 86, the mother, in her

---

2.     The court handwrote the following changes in the findings:  Finding 97, added "or supplements."  Finding 99, added "and does so find" and "further." Finding 101, added "reasonable and liberal."

handling of visitation, was guilty of "harmful parental misconduct which has been detrimental to the children. . . ." But in its bench comments, the court said nothing about the children having exhibited any detriment, and the record is barren of such evidence. According to the neutral custody evaluator's personal observations, "the children are bonded and have a good relationship with both parents. They appeared comfortable and safe while in the care of each of their parents."

[¶52.]      During the custody investigation process, the mother expressed concern about the father and his fiancé smoking in the presence of the children. In the findings, we read that "the court finds that [the mother's] accusations in regard to smoking around the children were made in an effort to justify further limitation of [the father's] visitation and contact with the children." Yet, at trial, the father admitted that he and his fiancé both smoked. He testified: "We never smoked in the house. Shellie and I have subsequently quit smoking." He assured the court that he knew it "was not a healthy thing[.]" Why, then, would the mother's concern about this translate into a finding of obstruction? How would she know whether the father and his fiancé were still smoking and where?

[¶53.]      The findings contain more of these one-sided inferences and contrived inadequacies. In the latter part of finding number 75, for example, the court announces there is "little evidence to indicate that the children have a strong relationship with any of [the mother's] extended family." Fact findings should be based on fact, obviously, having some connection to the evidence produced at trial. No evidence supports this finding. Not the custody evaluation. Not even the father's testimony.

[¶54.] Repeatedly, in connection with visitation, we see language in the findings describing the mother as having "demonstrated a pattern," "a profound lack of ability or willingness," a "pronounced inability or willingness," all raising "serious concerns," manifesting "deficiencies." But nowhere in the findings is there a single statement that the mother violated any court order on visitation. She is faulted for not granting the father "additional" or "extra" time with the children. And even though it was beyond contention that the children were "more closely attached" to the mother, especially the twins, such was deemed in the findings to be a "minimal advantage."

[¶55.] In the spring of 2005, the father was arrested for domestic assault on the mother. He later received a deferred sentence on a reduced charge of disorderly conduct. The mother testified at trial that she thought the father was going to kill her. Apparently unsure, the court, when it commented on this at the close of trial, remarked that "none of us will ever be able to fully sort out what happened that night." Yet as crafted by the father's attorney, the court's finding number 43 proclaims: "The evidence suggests that both parties were most likely at equal fault during the disturbance which led to [the father's] arrest."

[¶56.] Initially, there was a restraining order, but it was eventually lifted. That summer, divorce proceedings commenced in the Iowa courts, and the mother, an M.D., moved to Sioux Falls to begin a medical residency. On November 29, 2005, she gave birth in Sioux Falls to twin girls, Faith and Grace. During these times, by the parents' own admissions, they were unable to talk with each other. Communication between them was "primarily by means of email." As the custody

evaluator testified, "[T]he communication between these two people is just -- is just non-existent. It's just not there. I think they both tend to hear things from their own vantage point, and that is a major -- of a major concern." Yet the findings, while acknowledging that "both parents have experienced some difficulty with the communication between one another," heap the blame for lack of communication on the mother and deduce that it was all done to deny the father contact with the children.

[¶57.] More disturbing are the findings on the mother's decision to nurse the parties' twin daughters. Even infant nursing was portrayed in the court's findings as an obstruction. Finding number 97:

> [The mother's] decision to nurse the children was taken to an extreme, and she perceived her interest in nursing the children as superior to that of [the father's] right to develop a meaningful relationship with the children at an early age. [The mother] failed to pursue reasonable alternatives or supplements to the breast feeding, which alternatives would have not interfered with [the father's] relationship with the children.

This finding does reflect the court's rather uninformed oral remarks. The court said, "I see no reason why these children should not have been able to travel and spend significant time in overnight visits with their father within weeks of their birth."

[¶58.] First of all, the father was living in West Des Moines, almost three hundred miles from Sioux Falls, and he did see the girls when he came to pick up or drop off their older son, Dylan. His contention was that visiting the girls in a hotel lobby for an hour every two weeks was not sufficient. Clearly that was inadequate

time. But it was the father who testified that at his insistence he needed "the exchanges to occur in a public location." Hence they agreed to meet in a hotel lobby.

[¶59.] Second, for over a year after their birth there was no court order in place regarding visitation for these infants. If there had been an order entered in accord with South Dakota's shared parenting guidelines, the father would have been able to see his daughters more, especially as they grew older, but he would not have been able to take these nursing infants to West Des Moines "to travel and spend significant time in overnights visits." *See* SDCL ch. 25-4A (Appendix A, Guidelines 2.2 and 2.3).

[¶60.] In fact, when the case finally came up for a hearing on interim visitation, another circuit judge heard the matter in December 2006 and noted that extended overnight visitation for these babies was not practical: "If you folks were living within a few miles, ten, fifteen, twenty miles of each other, the court would be looking at contact anywhere from two to three times a week or for two or three hours at a time, and even depending upon the relationship that exists, maybe an overnight visit. But that's not realistic here." Nonetheless, despite our guidelines and the other judge's ruling, the mother's "extreme" nursing became yet another ground in the court's findings to justify placing primary physical custody with the father.

[¶61.] Most troubling are those matters absent from the findings. On October 18, 2007, the trial court appointed a neutral child custody expert, Dr. Andre B. Clayborne, to perform a home study evaluation. Dr. Clayborne's single-spaced, twenty-two page report was completed on May 26, 2008. He thoroughly examined

the children's situation, the parents' history, and their psychological profiles. Separate testing was conducted, collateral contacts were reviewed, and the parents' assessments of each other's capabilities were explored. In preparing his report, Dr. Clayborne conducted home visits with the children at both the mother's home in Sioux Falls and the father's home in West Des Moines. He found the children to be bonded to both parents. In the final analysis, however, he recommended that the mother "continue to be the children's primary care parent," with the father receiving liberal visitation. He also noted that he "did not find any information which would suggest the children would significantly benefit from a change in custody." Quite the opposite, according to Dr. Clayborne, "there was information suggestive that separating the children from their primary caregiver may actually be detrimental to them."

[¶62.]     To be sure, no court is bound by a custody evaluator's recommendation. We have long held that decision makers are entitled to disregard an expert's opinion if it is found to be unworthy of credence. Still, the reasons for having a court-appointed professional custody evaluation are compelling. Experienced evaluators can assist judges in piercing the facade parents sometimes display in court. Observing children interacting with their parents in their homes opens a door through which judges themselves cannot enter. In a courtroom setting, only a few hours may be available to assess parenting abilities, a poor substitute for the on-the-ground comprehensive view a professional custody evaluator can provide.

[¶63.]     One would expect, therefore, that before a court disregards a custody recommendation from its appointed expert, the court would at least make findings

explaining its reasoning.  After all, neither side questioned Dr. Clayborne's credentials or the quality and accuracy of his evaluation process.  In the attorney-prepared findings, though, no mention of Dr. Clayborne's ultimate custody recommendation can be found, much less any explanation for why it was rejected.  How does a balanced and methodical decision maker justify not even *considering* the custody recommendation made by the court's own appointed expert?

[¶64.]        Unquestionably, there was testimony by the father on his frustrations in communicating with the mother on all matters dealing with their children.  Even if the court accepted these grievances undigested, to base the decision on one issue — inability to agree on childcare and visitation — is to ignore the totality of factors a court should examine as set forth in *Fuerstenburg*.  Those factors were recited in the findings, but the decision hinged on the mother's perceived obstruction.  "Child custody disputes should not be decided solely on a listing of faults ascribed to one parent[.]"  *Fuerstenberg*, 1999 SD 35, ¶23, 591 NW2d at 807.  To reason that because the mother, the primary caregiver, was recalcitrant on visitation custody must be awarded to the father is to pose a false choice.  With these non-communicating parents, no matter which parent had primary custody, a rigid visitation schedule was going to be necessary.  Besides, the concerns the father brought up about the mother obstructing his relationship with the children were not borne out in the custody evaluation.  In fact, Dr. Clayborne testified that the father's animosity toward the mother "makes me hesitate just a little bit" about whether he would foster a healthy relationship between mother and children.  But,

Dr. Clayborne thought "he probably would." As for the mother, Dr. Clayborne had no hesitancy.

[¶65.] Despite my grave reservations about the trial court's decision, I cannot say that the court's ultimate ruling on custody was wrong. If Dr. Clayborne's evaluation deserves any consideration, it must be acknowledged that while he did testify that "making a change at this point might be more concerning and could be potentially damaging to the kids," he also said, "I don't think the court would err in placing these kids in either parent's primary care."

[¶66.] Nonetheless, the process used in rendering this decision was flawed. True, our standard of review is abuse of discretion, and choosing between two satisfactory parents "falls within a judge's discretion." Arneson v. Arneson, 2003 SD 125, ¶14, 670 NW2d 904, 910. But that does not end our inquiry on appeal. If it did, then every custody dispute between fit parents would be unreviewable. One way to discern whether a court made a wrong decision is to examine the process the judge used in making that decision. "A flaw in the process is easier to detect than a flaw in the result[.]" United States v. Beasley, 809 F2d 1273, 1279 (7thCir 1987). "The principled and just functioning of the judicial system depends on careful observation of the rules that focus attention on the proper grounds of decision." *Id.*

[¶67.] Did the circuit court focus attention on the proper grounds for decision? Failing to do so, by definition, constitutes an abuse of discretion. Willoughby v. Grim, 1998 SD 68, ¶6, 581 NW2d 165, 167-68 (citations omitted). To answer this question, all we can appropriately review are the stilted findings and conclusions entered here. Far from being balanced and methodical, these findings

offer little assurance that the court gave impartial consideration to all the relevant circumstances.

[¶68.] We are all prone to error in making difficult decisions, and the press of heavy caseloads can be difficult, but for the sake of a process that aspires to truth and accuracy, decisions should be couched in the language of the decision makers, reflecting their own independent observations and reasoning. Our judicial process is demeaned when a court adopts overreaching and unwarranted findings prepared by counsel for the winning side.