#26957-a-DG

**2015 S.D. 59**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

CRAIG WILLARD MCCARTY,                    Plaintiff and Appellant,

    v.

KIMBERLY PAULL MCCARTY,                   Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JANINE KERN
Judge

\* \* \* \*

LINDA LEA M. VIKEN
KYLIE M. RIGGINS of
Viken & Riggins Law Firm
Rapid City, South Dakota                  Attorneys for plaintiff
                                         and appellant.

ROBERT J. GALBRAITH of
Nooney & Solay, LLP
Rapid City, South Dakota                  Attorneys for defendant
                                         and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 23, 2015

OPINION FILED **07/08/15**

#26957

GILBERTSON, Chief Justice

[¶1.]        Dr. Craig McCarty (Father) appeals after the circuit court changed primary physical custody of the parties' two children, N.M. and C.M., to Kimberly McCarty (Mother).  Father argues on appeal that the circuit court erred when it found that a substantial change in circumstances was not required to change custody.  Father also argues that the court erred when it found that returning primary physical custody to Mother was in the best interests of the children based on a substantial change in circumstances.  We affirm.

*Facts and Procedural History*

[¶2.]        Father and Mother divorced in July 2007.  At the time of the divorce, the parties agreed to share joint legal custody of N.M. and C.M., with Mother having primary physical custody.  After the divorce, Mother maintained residence in Box Elder, South Dakota, and Father moved to Gillette, Wyoming.  The children would usually spend the school year in Box Elder and then stay in Gillette during the summer.  Mother had primary physical custody of the children for four years until Father filed a petition for a change of custody in June 2011.  Father alleged that Mother was not adequately addressing the children's special needs and was not honoring Father as a parent.

[¶3.]        On June 6, 2012, following a contested trial, the circuit court changed primary physical custody from Mother to Father.  The court entered findings of fact, conclusions of law, and an order modifying child support and changing custody.  In its conclusions of law, the court stated, "Unless otherwise agreed by the parties in writing, the [c]ourt will set up a review hearing in May 2013."  The children

-1-

subsequently moved to Gillette and resided with Father and Dr. Breck McCarty (Stepmother).

[¶4.]        On May 28, 2013, Mother filed a motion for a change of custody. The court held a two-day trial on August 22 and 23, 2013. After hearing considerable testimony from Mother, Father, Stepmother, Tom Collins (the court-appointed parenting coordinator), and Dr. Jim Simpson (the custody evaluator), the court changed custody from Father back to Mother. The circuit court held that a showing of a substantial change in circumstances was not required because the circuit court had scheduled a "review hearing" one year earlier. The circuit court further held that, even if a substantial change in circumstances was required, a substantial change in circumstances existed in this case based on "the breakup and the contentious dissolution of [Stepmother] and [Father's] medical group" and "[Stepmother's] diagnosis in mid-January of stage 4 metastasized breast cancer with cancer now present, in essence, in her liver." Lastly, the circuit court held, after analyzing the *Fuerstenberg* factors, that it was in the best interests of the children for Mother to again have primary physical custody. Father appeals.

[¶5.]        Father raises two issues in this appeal:

> 1.    Whether the circuit court erred in holding that it was not required to find a substantial change in circumstances.
>
> 2.    Whether it was in the best interests of the children to change primary physical custody back to Mother based on a substantial change in circumstances.

*Standard of Review*

[¶6.]        "We review 'child custody decisions under the abuse of discretion standard of review.'" *Roth v. Haag,* 2013 S.D. 48, ¶ 11, 834 N.W.2d 337, 339-40

#26957

(quoting *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 13, 826 N.W.2d 627, 633). "An abuse of discretion is a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Id.* ¶ 11, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 14, 826 N.W.2d at 633). "An abuse of discretion occurs in a child custody proceeding when the [circuit] court's review of the traditional factors bearing on the best interests of the child is scant or incomplete." *Kreps v. Kreps*, 2010 S.D. 12, ¶ 25, 778 N.W.2d 835, 843 (quoting *Pietrzak v. Schroeder,* 2009 S.D. 1, ¶ 37, 759 N.W.2d 734, 743). Further, "findings of fact are reviewed under the clearly erroneous standard of review." *Schieffer*, 2013 S.D. 11, ¶ 15, 826 N.W.2d at 633. Finally, "this Court gives due regard to the [circuit] court's opportunity 'to judge the credibility of witnesses and to weigh their testimony.'" *Id.* (quoting *Walker v. Walker*, 2006 S.D. 68, ¶ 11, 720 N.W.2d 67, 70-71).

*Decision*

[¶7.]     1.     *Whether the circuit court erred in holding that it was not required to find a substantial change in circumstances.*

[¶8.]     The circuit court held that Mother was not required to show a substantial change in circumstances because the court intended to hold a "review hearing" in May 2013. Father argues that the two-day August 2013 hearing was more than a "review hearing." It was a "contested proceeding," which required Mother to "show a substantial change of circumstances" because the circuit court did not grant interim custody to Father in 2012, but rather permanent physical custody. *See Benson v. Loffelmacher*, 2012 S.D. 75, ¶ 21, 824 N.W.2d 82, 86. We agree.

[¶9.]      In *Benson*, the circuit court entered an order granting interim custody to the father while awaiting a decision from the child custody evaluator and while the motion for custody was pending a final hearing. *Id.* ¶¶ 5-6, 824 N.W.2d at 83. In the present case, the circuit court was not awaiting a decision from the evaluator, nor was there a motion for a change of custody pending before the court from June 2012 to May 2013. In *Benson*, the circuit court later held a hearing in which "the court indicated that it would be considering the evidence and testimony from the earlier interim hearing along with any new evidence." *Id.* ¶ 16, 824 N.W.2d at 85. In this case, however, the court's focus was on new evidence and testimony since Father received primary physical custody in June 2012. After the June 2012 hearing, the circuit court "vested" Father with primary physical custody, i.e., the court's decision was definitive and final.[1] Mother made a formal motion with the court to change custody, and the two-day, August 2013 "contested proceeding" ensued. It has long been the rule in South Dakota that to modify a custody decree rendered after a contested hearing, the moving party must show a substantial change in circumstances. *See* SDCL 25-4-45; *Benson*, 2012 S.D. 75, ¶ 21, 824 N.W.2d at 86; *McKinnie v. McKinnie*, 472 N.W.2d 243, 244 (S.D. 1991) (holding that the party seeking modification must show a substantial change in circumstances); *Kolb v. Kolb*, 324 N.W.2d 279, 281-83 (S.D. 1982) (requiring a

---

1.      Finality is confirmed by the circuit court's findings of fact from the two-day August 2013 trial. The court stated as follows:

> **The court:** The [c]ourt did not designate [custody to Father] as a temporary determination. The [c]ourt simply changed primary physical custody to . . . [F]ather and set a review hearing in one year.

substantial change in circumstances even when the "original custody order was based on a stipulation of the parties[]"). Therefore, we hold that Mother was required to show a substantial change in circumstances to change custody.[2]

[¶10.]    *2.    Whether it was in the best interests of the children to change primary physical custody back to Mother based on a substantial change in circumstances.*

[¶11.]    The circuit court found that it was in the best interests of the children to change primary physical custody back to Mother based on a substantial change in circumstances. The court's decision rested primarily on two considerations: the stress brought on by the dissolution of Father and Stepmother's medical group and Stepmother's diagnosis of stage 4, metastasized breast cancer that subsequently spread to her liver. The court also provided an in-depth analysis of the *Fuerstenberg* factors. Father contends on appeal that the two main reasons cited by the court do not constitute a substantial change in circumstances and, assuming arguendo that they do constitute a change in circumstances, they are neither relevant nor supported by the evidence.

[¶12.]    "When determining custody, the court shall be guided by consideration of what appears to be for the best interests of the [children] in respect to the [children's] temporal and mental and moral welfare." *Roth*, 2013 S.D. 48, ¶ 13, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 17, 826 N.W.2d at 634) (internal

---

2.    While the circuit court erred in finding that a substantial change in circumstances was not required, the court alternatively held:

> In this case [M]other filed a formal motion to change custody and the [c]ourt, as an alternative finding, notes that . . . if a reviewing court would determine that a substantial change in circumstances was required, the [c]ourt finds that there are substantial changes in the circumstances of the parties today.

quotation marks omitted); SDCL 25-4-45. "The [circuit] court may, but is not required to, consider the following *Fuerstenberg* factors in determining the best interests and welfare of the [children]: parental fitness, stability, primary caretaker, [children's] preference, harmful parental misconduct, separating siblings, and substantial change of circumstances." *Roth*, 2013 S.D. 48, ¶ 13, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 17, 826 N.W.2d at 634). "We encourage [circuit] courts to take a balanced and systematic approach when applying the factors relevant to a child custody proceeding." *Id.* (quoting *Schieffer*, 2013 S.D. 11, ¶ 18, 826 N.W.2d at 634). "However, 'a court is not bound to make a specific finding in each category; indeed, certain elements may have no application in some cases, and for other cases there may be additional relevant considerations. In the end, our brightest beacon remains the best interests of the [children].'" *Id.* (quoting *Beaulieu v. Birdsbill*, 2012 S.D. 45, ¶ 10, 815 N.W.2d 569, 572).

*Fitness*

[¶13.]    When looking at fitness of the parents, circuit courts may look at the following:

> (1) mental and physical health; (2) capacity and disposition to provide the [children] with protection, food, clothing, medical care, and other basic needs; (3) ability to give the [children] love, affection, guidance, education and to impart the family's religion or creed; (4) willingness to maturely encourage and provide frequent and meaningful contact between the [children] and the other parent; (5) commitment to prepare the [children] for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the [children] witness[] firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

*Schieffer*, 2013 S.D. 11, ¶ 17, 826 N.W.2d at 634 (quoting *Kreps*, 2010 S.D. 12, ¶ 26, 778 N.W.2d at 843-44).

[¶14.] The court first looked at the mental and physical health of the parties. The court said both parents were in good mental and physical health. However, the court believed Stepmother's health was "in crisis" because of her cancer. Testimony at trial established that when Stepmother was diagnosed and began chemotherapy in 2013, Stepmother would spend "ten plus hours a week" receiving treatment. For the following three to five days after chemotherapy, she would become "very, very fatigued and dehydrated." By the time of the 2013 trial, Stepmother had finished chemotherapy and required treatment only "an hour every three weeks," plus some visits to her oncologist. Stepmother admitted her cancer was not curable and that the prognosis was not good. In fact, Father's testimony established that stage four metastasized breast cancer usually resulted in death within five years. However, Father also testified that Stepmother's new medication looked promising and that some patients' cancer had gone into and stayed in remission. The circuit court expressed concern that Father minimized Stepmother's condition and the impact it had on the children. While Father was optimistic about Stepmother's recovery, he admitted that with Stepmother's condition came much uncertainty.

[¶15.] The circuit court found: "Both parents have the capacity to provide the children with protection, food, clothing, medical care and other basic needs;" and, "Both parents have the ability to give the children love, affection, guidance and to work on their education." The court reprimanded Mother for not always encouraging contact between the children and their Father and Stepmother and

noted Father did a better job facilitating meaningful contact. Both parents could encourage the family's religious beliefs, encourage education, and prepare the children for adulthood.

[¶16.] Father argues that the circuit court became fixated on Stepmother's condition and disregarded or minimalized the other factors. We said in *Arneson v. Arneson*, "Although the health and physical condition of a parent [or stepparent] is a valid factor in determining a child's best interests, a judge must neither presume the existence of limitations nor fail to adequately consider other relevant factors." 2003 S.D. 125, ¶ 21, 670 N.W.2d 904, 912. Even though *Arneson* dealt with a physical disability and not a life-threatening illness, Father contends the same rationale applies. While the same rationale may well apply, the record indicates that the circuit court's concerns about Stepmother's cancer were justified. The circuit court stated:

> [Stepmother's] physical health is in crisis with a stage 4 diagnosis. That her role in this case and her ability to co-parent, along with [Father], is certainly one of the things the [c]ourt considered in making this move. Namely, the teamwork approach testified to by both doctors in taking the children into their care and investing deeply in their lives and providing them with the best possible childhood is something that this [c]ourt relied on significantly.

The "teamwork approach" the court referenced is the work schedule organized by Father and Stepmother to care for the children. Father and Stepmother alternated working days so that one parent could take the children to school, pick them up, be home with them, etc. The court was concerned that the flow and organization of this schedule would be interrupted due to Stepmother's cancer, especially given the uncertainty and unpredictability of her condition. Because of the uncertainty facing

Stepmother's condition and the amount of time that was and may be devoted to treatment, the court found the first *Fuerstenberg* factor weighed in Mother's favor.

### Stability

[¶17.] When analyzing stability, the circuit court should look at the following subfactors:

> (1) the relationship and interaction of the [children] with the parents, step-parents, siblings and extended families; (2) the [children's] adjustment to home, school and community; (3) the parent with whom the [children have] formed a closer attachment, as attachment between parent and [children] is an important developmental phenomena and breaking a healthy attachment can cause detriment; and (4) continuity, because when [children have] been in one custodial setting for a long time pursuant to court order or by agreement, a court ought to be reluctant to make a change if only a theoretical or slight advantage for the [children] might be gained.

*Roth*, 2013 S.D. 48, ¶ 14, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 17, 826 N.W.2d at 634).

[¶18.] The circuit court found that the children had a good relationship with both parents and Stepmother. The court noted that the children did have some difficulty in adjusting to Gillette, but had made strides academically. For example, the children were involved in an after-school program and were learning to socialize. However, the court expressed concern over C.M.'s friendship with a much younger girl, and how such a friendship was not appropriate. Dr. Simpson testified that the children were more relaxed in Mother's home and that they felt more closely bonded with her. Further, the children were enrolled in extra-curricular activities like swimming, 4-H, scouting, and music lessons in Box Elder. Father and Stepmother chose not to enroll the children in extra-curricular activities in Gillette,

but they stated that the children's after-school programs adequately provided for their social needs. The court believed the children were more integrated in the Box Elder community because they had spent most of their young lives living there. Mother also presented evidence that she would have more available free time for the children.

[¶19.] The circuit court also noted that Stepmother's health impacted the stability of the Father's home. "The [c]ourt is concerned that because of the instability now present in the home of [Father], despite every effort to maintain routine and structure, there are some very difficult life challenges facing [Father and Stepmother] that are going to impact the children." The court voiced concern about how four and a half months of chemotherapy impacted C.M. C.M., who has special needs, had bed wetting problems, anger issues, and disciplinary issues while staying with Father. While Father and C.M. worked through some of those issues, the court expressed concern for C.M.

[¶20.] The court also cited "the breakup and the contentious dissolution of [Stepmother] and [Father's] medical group" as a source of instability. Father and Stepmother were partners in a medical group until discord arose among the partners. The medical group dissolved. Father testified that along with the dissolution came "considerable financial hardship." After hearing testimony about the dissolution from Father and Stepmother, the court characterized the post-dissolution financial situation as "devastating." For example, the court had previously required Father to pay for the children's health insurance. While the medical group dissolved, Father's insurance lapsed, and Mother was unable to fill

N.M.'s prescription. In the wake of the dissolution, Father and Stepmother created their own medical practice. At the time of the hearing, Father and Stepmother were continuing to pay debt and had yet to realize any profit. Mother, on the other hand, had a steady job as a bus driver and lunchroom monitor at a local school. In the end, the court appeared to weigh this factor in favor of Mother, and we cannot say that such a finding was clearly erroneous or "not justified by, or clearly against, reason and evidence." *See Roth*, 2013 S.D. 48, ¶ 11, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 14, 826 N.W.2d at 633).

### Primary Caretaker

[¶21.] Mother had been the primary caretaker of the children for most of their young lives, but Father also served as primary caretaker for a year. Both parents had the ability to care for the children. The court did not weigh this factor in favor of either party.

### Parental Misconduct

[¶22.] The court found that this is "not a case of parental misconduct." However, the court reprimanded Mother for failing to fully cooperate with Father and using the children to gather intelligence for future litigation. *See Fossum v. Fossum*, 1996 S.D. 38, ¶ 23, 545 N.W.2d 828, 832 ("[T]he courts, the parties and especially the children must be protected from endless and vexatious litigation and the resulting uncertainty flowing therefrom." (Italics removed.) (quoting *Hanks v. Hanks*, 334 N.W.2d 856, 858 (S.D. 1983)). The court said it would impose sanctions on Mother if she continued to alienate the children from Father and Stepmother.

Mother promised to improve her behavior. The court did not weigh this factor in either Mother's or Father's favor.

***Children's Preference***

[¶23.]    The circuit court found that the children had a closer relationship with their Mother and were more relaxed in her home. However, the court did not make a specific finding on the children's preference. The children did not testify.

***Separating Siblings***

[¶24.]    Father and Stepmother have a young son, who is the stepbrother of both N.M. and C.M. "Generally, siblings and half-siblings 'should not be separated absent compelling circumstances.'" *Simunek v. Auwerter*, 2011 S.D. 56, ¶ 10, 803 N.W.2d 835, 837 (quoting *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, ¶ 32, 591 N.W.2d 798, 809). "However, this is not an absolute rule, and 'maintaining children in the same household should never override' what is in the best interests of a child." *Id.* (*Fuerstenberg*, 1999 S.D. 35, ¶ 32, 591 N.W.2d at 809). "Separating siblings is 'one of several factors courts consider in determining the best interests of the children.'" *Id.* (quoting *Hathaway v. Bergheim*, 2002 S.D. 78, ¶ 32, 648 N.W.2d 349, 354 (Gilbertson, C.J., dissenting)).

[¶25.]    The circuit court acknowledged that stepsiblings should not be separated absent compelling circumstances and held that compelling circumstances existed in this case. The court found "in weighing the children's adjustments and the uncertainty in [Father's] home at this point, with reference to [Stepmother's] diagnosis, and the overwhelming time commands of their business, her illness, and the other factors in the case, that the necessity and welfare of C.M. and N.M.

warrant separating the siblings." *See Price v. Price*, 2000 S.D. 64, ¶ 46, 611 N.W.2d 425, 435 (holding that siblings should not be separated unless demanded by necessity and welfare). The court further noted that the impact of separation would be less severe in this case because the stepsiblings had only resided together for nine months. While this factor is admittedly a close call and may even weigh in favor of Father (as Mother acknowledges in her reply brief), we cannot say that such a finding was clearly erroneous or "not justified by, or clearly against, reason and evidence." *See Roth*, 2013 S.D. 48, ¶ 11, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 14, 826 N.W.2d at 633). "It is not for this Court, but for the [circuit] court, to gauge the credibility of the witnesses and to weigh the significance of their testimony." *Fuerstenberg*, 1999 S.D. 35, ¶ 22, 591 N.W.2d at 807.

***Substantial Change in Circumstances***

[¶26.]     As has been previously discussed, the circuit court relied primarily on two substantial changes in circumstances: "the breakup and the contentious dissolution of [Stepmother] and [Father's] medical group" and "[Stepmother's] diagnosis in mid-January of stage 4 metastasized breast cancer with cancer now present, in essence, in her liver." The witnesses in this case testified to the financial difficulty and instability caused by the dissolution of Father and Stepmother's medical group and the formation of Father and Stepmother's new medical partnership. Evidence was presented that Father and Stepmother argued about the dissolution and that their arguing affected the children. Additionally, the court found it "very concerning" that neither the parties nor the report prepared by Dr. Simpson made the court aware of Stepmother's illness, chemotherapy

treatment, or prognosis until the August 2013 trial.  The court believed this had an "extremely serious and dramatic effect" on this case.

***Best Interests of the Children***

[¶27.]        We conclude the circuit court took a "balanced and systematic approach when applying the factors relevant to [this] child custody proceeding." *See Roth*, 2013 S.D. 48, ¶ 13, 834 N.W.2d at 340 (quoting *Schieffer*, 2013 S.D. 11, ¶ 18, 826 N.W.2d at 634).  The court conducted a two-day hearing, listened to extensive testimony, had an opportunity to gauge the credibility of the witnesses, weighed the evidence before it, and thoroughly explored the *Fuerstenberg* factors in its oral findings of fact and conclusions of law.  The circuit court's "review of the traditional factors bearing on the best interests of the [children was neither] scant [n]or incomplete." *See Kreps*, 2010 S.D. 12, ¶ 25, 778 N.W.2d at 843 (quoting *Pietrzak,* 2009 S.D. 1, ¶ 37, 759 N.W.2d at 743).  Therefore, the circuit court did not abuse its discretion when it determined that returning primary physical custody to Mother was in the best interests of the children.  We, therefore, affirm.

[¶28.]        ZINTER, SEVERSON, and WILBUR, Justices, and PEKAS, Circuit Court Judge, concur.

[¶29.]        PEKAS, Circuit Court Judge, sitting for KERN, Justice, disqualified.